## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **HITACHI RAIL STS USA, INC.** | ) | |
| **1000 Technology Drive** | ) | |
| **Pittsburgh, PA  15219** | ) | **CASE NO.:** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **v.** | ) | |
| | ) | |
| **MASSACHUSETTS BAY** | ) | |
| **TRANSPORTATION AUTHORITY,** | ) | |
| **10 Park Plaza** | ) | |
| **Boston, Massachusetts 02116** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Defendant Massachusetts Bay Transportation Authority ("MBTA") has materially breached its contract with Plaintiff Hitachi Rail STS USA, Inc., f/k/a Ansaldo STS USA ("Hitachi Rail") for the installation of key safety systems and caused Hitachi Rail to suffer damages in excess of **$158,382,985.31**.

Positive Train Control ("PTC") systems are designed to prevent train-to-train collisions, over-speed derailments, incursions into established work zones, and movements of trains through switches left in the wrong position.  Automatic train control ("ATC") systems integrate all the vital and non-vital functions that guarantee the safe operation of trains.  In 2008, the Rail Safety Improvement Act became law, requiring PTC systems to be fully implemented by December 31, 2015[1] on certain railroads' main lines, including commuter rail passenger service.

---

[1] In October 2015, Congress extended the deadline for full implementation by at least three years, and required the Federal Railroad Administration to approve any railroad's request for an "alternative schedule and sequence."

On or about December 18, 2015 – years after the passage of the 2008 Rail Safety Improvement act, and just days prior to the original federally mandated deadline for full implementation – Defendant MBTA entered into a contract with Hitachi Rail (the "Base Contract") to install these federally mandated safety systems.  Pursuant to the Base Contract, Hitachi Rail agreed to design, build and install a PTC system (as defined in Base Contract) on Defendant MBTA's North Side Commuter Rail lines by August 2020, for a price of $338,457,134.00 (such work, as amended by subsequent change orders, the "PTC Safety Project").  The Base Contract was then extended by change order fully executed June 18, 2019 to add installation of ATC systems to three (3) of Defendant MBTA's Southern lines (where ATC work was not initially covered) (hereinafter the "South Side ATC Work").

Roughly four (4) years into the PTC Safety Project execution, and while the Base Contract PTC and South Side ATC Work was still ongoing, Defendant MBTA nearly doubled the PTC Safety Project work and contract value by adding the supply and installation of certain ATC systems on the five lines for the North Side MBTA Commuter Rail (hereinafter the "North Side ATC Work") to align the ACSES II (PTC) system architecture in the North Side to the system on the southern lines.  As explained in further detail below, Defendant MBTA accomplished this added North Side ATC Work scope through the issuance of Change Order 21 (to the Base Contract) with an effective date of October 7, 2019, increasing the previously adjusted initial Contract Price ($303,761,293.81) by $253,000,000.00 to a new adjusted Contract Price of $556,761,293.81.[2]

---

[2] Prior to the issuance of Change Order 21, the initial Contract Price ($338,457,134.00) had been reduced to $303,761,293.81 by Change Orders 1 through 20. Since the issuance of Change Order 21, the Contract Price has been adjusted to roughly $548,000,000.  None of those prior or subsequent changes to the contract price impacts this lawsuit.

Significantly, Defendant MBTA first issued a request for proposal (the "RFP") for a design-build contract to supply and install the ATC systems on the North Side Commuter Rail lines, but then elected to cancel that RFP on the day bids were submitted and to instead negotiate a sole source fixed-price change order for the work with Hitachi Rail.  The MBTA obtained approvals from the Fiscal Management Control Board ("FMCB") of the MBTA authorizing this change in procurement approach.

Based on publicly filed information, Defendant MBTA faced ongoing budget constraints and a lack of funding for the North Side ATC Work.  On information and belief, the MBTA therefore sought to minimize the cost of the work contemplated by the RFP by fixing and defining the scope and changing the risk profile of the North Side ATC Work to be performed by Hitachi Rail in Change Order 21.  Unlike the canceled competitive RFP, Change Order 21 instead specified a ***fixed*** scope, which the Parties set out in precise terms in the "North Side ATC Change Order Technical Detail, dated 26 Sep 2019" attached to Change Order 21 (the "CO 21 Technical Detail").  This approach, which incorporated an MBTA directive to retrofit and reuse existing infrastructure wherever possible in order to reduce cost, resulted in a lower price than would have been possible with the canceled RFP's functional specification and requirement for all new infrastructure.

The fixed scope is evident, for example, from CO 21's treatment of signal houses.  Defendant MBTA's goal was to retrofit as many signal houses as possible to avoid the cost of installing all new signal houses.  Whereas the canceled RFP required installation of new signal houses as required to meet its functional specification (and without any listed quantities), the CO 21 Technical Detail specified the precise number and type of signal houses required *per*

*commuter rail line*, including whether the signal houses would be "new" or "retrofits" of existing signal houses.

Change Order 21 also modified and extended the overall construction schedule for the PTC Safety Project (now including the works specified in the CO 21 Technical Detail) through May 30, 2022, and applied different commercial terms to the works subject to Change Order 21 than to that required under the Base Contract, including, for example, limitations on Hitachi Rail's profit.

Throughout Hitachi Rail's work on the PTC Safety Project, Defendant MBTA has repeatedly required Hitachi Rail to perform work beyond what was agreed to in the Base Contract and in Change Order 21, and then refused to pay for it.  Some of this extra work was MBTA Railroad Operations directing changes after designs had already obtained Defendant MBTA's approval.  Other times, Defendant MBTA requested design changes after installation had begun or after work was completed.  This practice, among other things, forced Hitachi to work in an emergency status to expedite solutions without being able to competitively negotiate costs with subcontractors.

The PTC Safety Project is nearing completion, but continues to be plagued by a number of problems, for which Defendant MBTA is responsible.  These include delays driven by the aforementioned changes to the contractually-agreed work, ongoing lack of MBTA-supplied flagger support necessary for Hitachi Rail to perform work in the right of way, MBTA track access denials, MBTA-mandated resequencing, and COVID-19 impacts.  Defendant MBTA also elected to prioritize the work of other Contractors working for Defendant MBTA (including Defendant MBTA's Operator Keolis Commuter Services, LLC), disrupting and delaying the work of Hitachi Rail and causing it further damages.  Notwithstanding that Defendant MBTA

has repeatedly delayed, suspended, disrupted, and interfered with Hitachi Rail's work on the PTC Safety Project and Change Order 21, Defendant MBTA has refused to compensate Hitachi Rail for the same or to grant the extensions of time that are the subject of this Complaint. Despite these substantial challenges and the large sums of uncompensated costs it has borne on Defendant MBTA's behalf, Hitachi Rail continues to complete this important safety work on the MBTA Commuter Rail system for the benefit of the Commonwealth of Massachusetts.

In order to be made whole, Hitachi Rail sues Defendant MBTA, seeking to recover four main categories of damages.  First, Hitachi Rail seeks to recover for unpaid materials and work beyond the defined scope of works agreed by the Parties in Change Order 21.  Second, Hitachi Rail seeks to recover compensation for delays and disruptions caused by Defendant MBTA. Third, Hitachi Rail seeks to recover losses that it suffered due to Defendant MBTA's refusal to timely grant "system acceptance" related to PTC work on lines currently in revenue service. Fourth, Hitachi Rail seeks compensation for other unpaid direct costs (in addition to and distinct from the above) resulting from changes dictated by Defendant MBTA and/or differing site conditions.  Hitachi Rail also claims entitlement to an extension of time to account for the MBTA-caused delays to key dates and milestones in the contract.

## PARTIES AND JURISDICTION

1.     Hitachi Rail is a corporate entity formed in Delaware, headquartered at 1000 Technology Drive, Pittsburgh, PA 15219, and authorized to transact business in Massachusetts at all relevant times.

2.     Hitachi Rail is formerly known as Ansaldo STS USA, and is a successor in interest to the same.

3.      Defendant MBTA is a public agency and a division of the Massachusetts Department of Transportation.  Defendant MBTA maintains a principal office at the Transportation Building, 10 Park Plaza, Room 6720, Boston, Suffolk County, Massachusetts.

4.      This Court has original jurisdiction under 28 U.S.C. § 1332, because the matter is between parties of different states and the amount in controversy exceeds $75,000.

5.      Venue is proper under relevant contract terms between the Parties, which state:

> It is further agreed between the parties hereto, that the Contractor, wherever incorporated and wherever allowed to do business, shall, in the event of any misunderstanding of the construction of the language contained in the Contract, violations of the terms of the Contract, and/or claims against the Authority, restrict its actions in seeking relief, recompense or damages to the processes in the venue of the Commonwealth of Massachusetts.

6.      Venue is also proper under 28 U.S.C. § 1391, in that a substantial part of the events giving rise to the claims at issue in this case took place in this judicial district.

## FACTS

7.      A multitude of safety failures have occurred on Defendant MBTA's rail lines in recent years, including recent events of a derailment, an electrified third rail causing injury to two maintenance workers splicing wires, track inspection failures that prompted an independent safety investigation and systemwide speed restrictions, a commuter rail train engine catching fire in 2021, and a 2022 fatal crash, where an inbound commuter train struck a car in the crossing near the North Wilmington MBTA Station.  This history underscores the importance of safety system improvements on Defendants MBTA's rail systems.

8.      Due in material part to federal law requirements from the Rail Safety Improvement Act of 2008 regarding safety system improvements, Defendant MBTA entered into

the Base Contract with Hitachi Rail to design, build and install PTC technology on the MBTA Commuter Rail.

9.      The Rail Safety Improvement Act was prompted by a 2008 Chatworth train collision between a Union Pacific freight train and a Metrolink commuter train which resulted in 25 deaths.

10.     The Rail Safety Improvement Safety Act requires certain railroad lines, including those that are the subject of this Project, to, among other things, implement PTC systems.  All PTC systems are generally comprised of an on-board apparatus for the locomotive controlling each applicable train, wayside devices (such as wayside interface units), a centralized dispatch system in a back office, and a communication system that links all components.  *See Update on MBTA Installation of Positive Train Control Technology*, MBTA (Mar. 7, 2017), https://www.mbta.com/news/2017-03-07/update-mbta-installation-positive-train-control-technology (last visited Mar. 31, 2024).

11.     When the Rail Safety Improvement Act was passed in October 2008, it specified a deadline of December 31, 2015 for the implementation of required PTC systems.

12.     The MBTA's Commuter Rail system is subject to the requirements of the PTC Safety Act.

13.     In October 2015, Congress extended the deadline for full implementation of required PTC systems to at least December 31, 2018, with an option for a later deadline if the Federal Railroad Administration ("FRA") approved such a request from a railroad and the final deadline was no later than December 31, 2020.

14.     As reported by the MBTA, the MBTA submitted a PTC Implementation Plan to the FRA seeking to extend the December 31, 2018 deadline.  Specifically, the MBTA's proposed

plan provided for installation of the hardware on all Commuter Rail lines and two pilot lines

(Stoughton and Lowell Lines) by the end of 2018, with full PTC implementation by December

31, 2020.  *See Update on MBTA Installation of Positive Train Control Technology*, *supra*.  That

request was later granted by the FRA, giving the MBTA an extension through December 31,

2020 to implement PTC on the North Side Commuter Rail lines.

### The Base Contract

15.     On or about December 18, 2015, Defendant MBTA entered into Contract No. 42-

14 with Hitachi Rail (the aforementioned Base Contract) and Change Order No. 1 for Hitachi

Rail to perform the work advertised in the RFP, as amended by Change Order No. 1 (the "PTC

Work"), in exchange for a lump sum value of $338,457,134.00.

16.     The North Side Commuter Rail lines included in the PTC Safety Project are:

a.   The Fitchburg Line

b.   The Eastern Route Line (composed of the Newburyport Line and the

Rockport Line)

c.   The New Hampshire Main Line (Lowell Line)

i.   Including the Wildcat Branch connecting the New Hampshire Main

Line at Wilmington station to the Western Route Line at Wilmington

junction.

d.   The Western Route Line (Haverhill Line)

17.     Section 6.15 of the General Terms and Conditions of the Base Contract provides

the following Order of Precedence for Contract Terms:

a.   Change Orders and contract modifications;

b.   Clarifications of Specifications Addenda;

c.   General Terms and Conditions (Vol. 1);

    d.   Technical Requirements (Vol. 2);

    e.   Contract Drawings (Vol. 3);

    f.   Bonds/Certificates, Affidavits and other pertinent forms; and

    g.   Contractor's proposal

18.    Section 6.29 [*Change Order*] of the General Terms and Conditions of the Base Contract allows Defendant MBTA to issue written Change Orders.  Under Section 6.29.1.2, Change Order proposal pricing shall be based on generally accepted cost principles such as the Federal Acquisition Regulation ("FAR") Part 31.

19.    Section 6.30 [*Claims*] of the General Terms and Conditions of the Base Contract entitles the Contractor to bring a Claim "to seek adjustment in payment, terms, or schedule and for which said matter is not disposed of by agreement through a Change Order (see Section 6.29)."

20.    Relating to delays specifically, Section 6.30 provides that a contractor is entitled to ***both*** an extension of time and an adjustment to the Contract Price for any increase in the actual cost of performance of the Base Contract if "performance of ***all or any major portion of the work is suspended, delayed  or interrupted*** for any unreasonable period of time ***by an act or failure to act by the Authority*** in the administration of the Contract as required by the Contract, and without the fault or negligence of the Contractor" (emphases added).

21.    Section 6.30 requires that "[t]he MBTA shall respond to the [Contractor's] claim within thirty (30) calendar days of receipt of said claim" without exception.

### The PTC Work

22.    Upon information and belief, at the time it executed the Base Contract with Hitachi Rail, Defendant MBTA had yet to secure funding the PTC Safety Project.

23.     Upon information and belief, Defendant MBTA began the PTC Safety Project prior to securing funding in order to meet the mandatory deadlines, as extended, of the Rail Safety Improvement Act of 2008.

24.     In its November 2, 2015 Presentation to the MassDOT Fiscal Management Control Board, Defendant MBTA reported that:

- The Federal PTC mandate was "unfunded" and that there was "no significant State funding in place"

- Defendant MBTA was "forced to act" including: (i) "Develop[ing] alternative (phased) project approach to demonstrate early success"; (ii) "Develop[ing] alternative milestone payment plan to bridge funding gap"; and (iii) "Approach[ing] selected PTC System Supplier and form[ing] basis for Public-Private Partnership."

- "The MBTA selection team has completed its review of all technical and cost proposals with Ansaldo STS ("Ansaldo") emerging as the highest rated technical proposal and lower cost giving the MBTA the best value on the PTC Procurement."

- "Furthermore, the MBTA and Ansaldo have developed a Public-Private Partnership to deliver the PTC Project on an accelerated basis utilizing Ansaldo resources."

25.     After providing Hitachi Rail notice of its contract award, but before the contract was signed, the MBTA demanded agreement on unique loan terms, worth tens of millions of dollars, under threat of awarding the project to another company.

26.     More specifically, due to a lack of funding at the time of Base Contract, Defendant MBTA requested, and Hitachi Rail agreed, that Hitachi Rail's invoice payments would be deferred for the first 19 months after the Notice to Proceed ("NTP") was issued, meaning that Hitachi Rail was required to fund all work performed for the first 19 months of the PTC Safety Project (January 2016 – July 2017) without payment by Defendant MBTA, with repayment starting in month 20 to coincide with the estimated receipt by Defendant MBTA of Transportation Infrastructure Finance and Innovation Act ("TIFIA") loan funds. *See* Base Contract, Sect. 6.3 excerpted below (emphasis added):

6.3.1   The Authority shall make all payments to the Contractor in United States Dollars. Milestone Payments will be made with the approval of the MBTA Project Manager for this project.

***The Contractor agrees to defer invoice payments for the first 19 months after NTP. The Authority agrees that the initial payment will be made no later than month 20 after NTP***.

For each invoice submitted prior to the initial payment (currently projected in month 20 after NTP), the Authority agrees that the total amount of each approved invoice, or portion thereof, is due and owing in full, and is to be repaid based upon the graduated repayment schedule (deferred invoice payments, prior to the initial payment, are totaled and evenly spread for repayment over months 20 through 31).

Within fifteen (15) days of receipt of each invoice, the Authority shall determine the disposition of the invoice. Within fifteen (15) days of disposition, Authority will issue a notice to the Contractor accepting or rejecting the work associated with the invoice.

27.     Defendant MBTA issued a Notice to Proceed on January 13, 2016 authorizing Hitachi Rail to proceed with the so-called "Phase I" and "Phase II" work scope as well as certain Priced Options.

28.     Consistent with the above Base Contract provision, Hitachi Rail expected payment after its nineteenth month of work post-NTP and submitted invoices demanding the

same.  However, MBTA failed and refused to make its initial payment on "month 20" on the erroneous ground that the Parties had not yet agreed to a Schedule of Values for payments and used that as a basis to deprive Hitachi Rail of payment for the prior twenty (20) months of work performed by Hitachi Rail in furtherance of Defendant MBTA's PTC Safety Project.  Hitachi Rail did not receive such payments until months later than promised.

29.     Notwithstanding these early payment delays and resequencing directed by Defendant MBTA, Hitachi Rail successfully completed the PTC system on the North Side Commuter Rail lines over four (4) months prior to the FRA deadline of December 31, 2020, which allowed those lines to go into revenue service by August 27, 2020, with a significant upgrade to the safety of the commuter rail system – despite the resulting increased costs to Hitachi Rail.

### Change Order 21

30.     The Base Contract was extended by change order fully executed June 18, 2019 to add the South Side ATC Work, which was not included in the Base Contract.

31.     In order to fully comply with the Rail Safety Improvement Act, the MBTA also needed to perform the North Side ATC Work by a new deadline of 2022.  This North Side ATC Work was not included in the Base Contract.

32.     In November 2018, Defendant MBTA issued the competitive RFP to procure the North Side ATC Work on a design-build basis.  The scope of work contemplated by the RFP was functionally defined, *i.e.*, it required the contractor to achieve a set of functional objectives rather than specifying precise quantities of new signal houses, retrofit signal houses, searchlight signal replacements, and other materials to be supplied.  Even where the RFP provides expected quantities, such as with regards to searchlight signal replacements, it clearly states that such

quantities are "expected" and that the Contractor would be responsible to "replace all searchlight signals."  Proposals were due on February 28, 2019.

33.     On the date that proposals were due, Hitachi Rail submitted its proposal in response to the RFP, proposing a price in excess of $350,000,000.00.  Upon information and belief, there was at least one other bidder for this North Side ATC work.

34.     Upon information and belief, Defendant MBTA's budget for the North Side ATC Work was closer to $200,000,000.00.

35.     On the date that proposals were due (February 28, 2019), Defendant MBTA elected to cancel the RFP without explanation and after Hitachi Rail submitted its sealed bid (which was returned unopened).

36.     Instead, Defendant MBTA negotiated directly with Hitachi Rail to add the North Side ATC Work to the Base Contract by Change Order.

37.     During the price negotiations for such change order, Defendant MBTA asked Hitachi Rail to significantly reduce its proposal price and sign the change order on an unusually short timeline.  In order to accomplish Defendant MBTA's objective, the Parties departed from the functional scope of work that the canceled RFP had contemplated.  Instead, they negotiated a defined scope of work for the North Side ATC Work and agreed to a substantially reduced price based on that defined scope of work, which was premised on the ability to retrofit and re-use existing infrastructure in various locations.  That defined scope of work agreed to by the Parties is referred to as the CO 21 Technical Detail, which is expressly referenced in and attached to Change Order 21 executed by the Parties.

38.     Hitachi Rail commenced the North Side ATC Work in June 2019 under a limited Notice to Proceed to help Defendant MBTA meet the FRA-imposed deadlines for implementation of the North Side ATC Work.

39.     On October 25, 2019, Defendant MBTA and Hitachi Rail executed Change Order 21, which increased the Contract Price by $253,000,000.00 to $556,761.293.81 – an increase of 83%.

40.     Upon information and belief, as supported by MBTA's own fiscal reporting, Defendant MBTA did not have funding to pay for the North Side ATC Work at the time it executed Change Order 21.

41.     Change Order 21 requires Hitachi Rail to "furnish all necessary labor, materials and equipment to perform this work (the "North Side ATC") ***in accordance with the <u>attached scope of work</u>*** (North Side ATC Change Order Technical Detail, dated 26 Sep 2019)" (emphasis added).

42.     The CO 21 Technical Detail contains detailed schedules of the size, type and number of signal houses to be provided or installed by Hitachi Rail for the agreed upon $253,000,000.00 change order price.

43.     The $253,000,000.00 that Hitachi Rail agreed to be paid in exchange for the Change Order 21 scope of work covered ***only*** the work listed in the CO 21 Technical Detail.

44.     Further, Section 8.3 of the CO 21 Technical Detail expressly states that "[a]ny work pertaining to strengthening the existing signal structures or providing new structures is excluded from the cost proposal, ***except for the replacement of existing Searchlight signals and associated structures identified in Section 3.2.1.6 Table 1***" (emphasis added).

14

45.     As stated herein, Hitachi Rail reduced its price from its original bid in response to the canceled RFP to $253,000,000 after negotiations with Defendant MBTA because the scope of Change Order 21 was fixed and defined by the CO 21 Technical Detail, compared with the canceled RFP which was functionally defined.

46.     The CO 21 Technical Detail contains defined quantities rather than the functionally-defined scope of work contemplated in the canceled RFP.  Further, the CO 21 Technical Detail contains criteria that Hitachi Rail would be able to retrofit or otherwise re-use existing infrastructure at various locations.  Hitachi Rail relied on such criteria as Hitachi Rail was not afforded an opportunity to survey the lines and existing signal houses.

47.     Change Order 21 provides that it is subject to the Base Contract terms and conditions except as modified by the terms of the change order.

48.     Change Order 21 expressly provides that Hitachi Rail "will be granted an extension of time and will not be assessed with liquidated damages *for any excusable delay (e.g., Force Majeure Event), including actions of the MBTA*" (emphasis added).

49.     Change Order 21 also states:

> Given the extent and nature of the work to be performed under this Change Order, the limitations on percentage of profit contained in Section 6.29.1.2 of the terms and conditions of the Contract shall not apply to this Change Order.

50.     Change Order 21 was authorized and approved by the Fiscal Management Control Board of the MBTA prior to execution by Defendant MBTA.

## COUNT I – Breach of Contract

51.     Hitachi Rail adopts and incorporates by reference paragraphs 1-50 as if fully set forth herein.

52.     The Base Contract and the agreed Change Orders amending it, including agreed Change Order 21, constitute a valid and enforceable contract (the "Contract").

53.     The Contract obligates Hitachi Rail to perform the work set forth in the Contract in exchange for Defendant MBTA's obligation to fully and fairly compensate Hitachi Rail for the work performed, including costs for extra and additional work.

54.     During the course of the Project, Defendant MBTA changed the scope of work provided for in the Contract, accelerated Hitachi Rail's work under the Contract, and otherwise delayed, impacted or interfered with the PTC Work and the North Side ATC Work.

55.     Hitachi Rail notified Defendant MBTA of the claims detailed below in accordance with the Contract, for which the Contract entitles Hitachi Rail to compensation as well as extensions of time.

56.     Hitachi Rail has performed all of its obligations under the Contract.

57.     Hitachi Rail has incurred at least $158,382,985.31 in costs as a result of such changes to the Contract work, plus interest.

58.     Despite Hitachi Rail's repeated demands and attempts to resolve the claims detailed below, Defendant MBTA has failed and refused to issue Change Orders, to acknowledge delays, or to compensate Hitachi Rail for the costs and other impacts incurred by Hitachi Rail in connection with the same, in breach of the Contract.

59.     The MBTA's breaches of the Contract have caused Hitachi Rail to incur monetary damages in excess of $158,382,985.31, made up of the following categories of damages:

   a. Work Defendant MBTA demanded Hitachi Rail perform beyond the fixed price and terms of Change Order 21;

   b. Defendant MBTA-caused delays;

c.   Defendant MBTA's failure to grant contractual PTC System Acceptance; and,

d.   Other unfunded changes causing Hitachi Rail to incur direct costs.

A.   **Work Demanded Beyond Fixed Price and Terms Caused $36,131,331.82 of Damages**

60.   After agreeing to Change Order 21, Hitachi Rail undertook the defined scope of work detailed in the CO 21 Technical Detail.

61.   During the design process, Hitachi Rail discovered that the defined scope of work negotiated by Defendant MBTA in Change Order 21 was inadequate, and required significant revision, in order to accommodate and accomplish a complete ATC system installation for the five North Side lines referenced herein.  Specifically, contrary to the basis of the Change Order 21 scope and pricing, Hitachi Rail could not repurpose all of the existing signal houses on the North Side Commuter Rail lines indicated as such. Instead, Hitachi Rail needed to design and construct new, more, and substantially larger, signal houses at various locations (contrary to the site conditions indicated in the CO 21 Technical Detail) and to retrofit roughly twice the amount of signal houses indicated in CO 21 Technical Detail.

62.   In addition, completing the ATC system installations required more searchlight signal replacements than was written into the CO 21 Technical Detail.

63.   Contrary to the precise language in Change Order 21, and the attached CO 21 Technical Detail, Defendant MBTA takes the unreasonable position that Hitachi Rail should deliver (at Hitachi Rail's sole expense) whatever it takes to complete the ATC system installations on the five North Side lines – as if Hitachi Rail had entered into a more fulsome design-build contract with a functionally-defined scope, like the one contemplated by the canceled RFP, instead of the defined, quantity-limited scope of work to which the Parties actually agreed in Change Order 21.

17

64. Defendant MBTA's chosen position would improperly render the contractually defined specific quantities of items, such as signal houses and searchlight signals, entirely meaningless.

65. Defendant MBTA continually has required Hitachi Rail to perform work beyond the scope of Change Order 21, and refuses to pay for it.

66. In March 2022, Hitachi Rail requested an equitable adjustment to Change Order 21 for changes in size, type, and quantities of signal houses and searchlight signal replacements in excess of the amounts specified in the CO 21 Technical Detail back in September 2019 (and earlier for the searchlight signal replacements). Defendant MBTA denied Hitachi Rail's request on April 21, 2022.

67. As of March 2022, Hitachi Rail had to, or had designs to, retrofit 204 signal houses, compared with the 91 written into CO 21 Technical Detail.

68. Also, as of March 2022, Hitachi Rail had installed, or had designs to install, 232 new signal houses, compared to the 212 written into CO 21 Technical Detail.

69. Hitachi Rail has also incurred unreimbursed costs for Hitachi Rail's subcontractor to perform the searchlight signal replacements beyond the defined terms of the CO 21 Technical Detail.

70. Hitachi Rail has complied with its contractual obligations, including providing adequate notice to Defendant MBTA regarding the issues giving rise to this dispute.

71. Through no fault of Hitachi Rail, the work performed by Hitachi Rail went significantly beyond the scope of work in Change Order 21 and the attached CO 21 Technical Detail, causing Hitachi Rail to incur monetary damages in an amount to be proven at trial, but at least $36,131,331.82.

**B.** **MBTA Delays Caused $87,556,878.79 of Damages and 278 Days of Critical Path Delay**

72.     Defendant MBTA has a history of project mismanagement.[3]

73.     Following a similar pattern, the PTC Safety Project is also troubled by long delays caused by Defendant MBTA.

74.     During Hitachi Rail's performance of its obligations under the PTC Safety Project, Defendant MBTA caused 278 days of critical path delay, which was then superseded by Defendant MBTA usurping the schedule and adopting a so-called "Preferential Commissioning Plan" that extended the schedule and contractual milestones by 515 days.

75.     During the performance of the scope of work called for by Change Order 21, Hitachi Rail's performance of such work has been delayed, disrupted, interrupted and resequenced by Defendant MBTA's acts, or failure to act, without the fault or negligence of Hitachi Rail.

76.     In the period from the Change Order 21 limited notice to proceed through July 1, 2021 alone, Hitachi Rail suffered 278 days of excusable delay to the progress of the scope of work caused by the following events:

     a.  COVID-19 and resulting governmental orders, restrictions and associated impacts to the progress and cost of the work;

     b.  Defendant MBTA-directed work relating to the Gloucester Draw Bridge and resequencing of work in 2020;

---

[3] *See, e.g.*, Taylor Dolven, *MBTA to pay Chinese company another $148 million to get new Red and Orange Line cars by end of 2027*, Boston Globe (Mar. 28, 2024), https://www.bostonglobe.com/2024/03/28/metro/new-crrc-mbta-deal/; Rebecca Turco et al., *Most of the new MBTA Green Line tracks need to be fixed after 'construction, oversight failures'*, Boston 25 News (Oct. 20, 2023), https://www.boston25news.com/news/local/most-new-mbta-green-line-tracks-need-be-fixed-after-construction-oversight-failures/4SIYVTSVCVCQPO7EXDHJ27PCMY/; Taylor Dolven, *Orange Line train came dangerously close to track workers on March 1, MBTA reports*, Boston Globe (Mar. 14, 2024), https://www.bostonglobe.com/2024/03/14/metro/orange-line-near-miss/.

c.  Fitchburg Power Easement and ROW Issues;

d.  Block & Control Line Changed Criteria and Issues;

e.  RFI 136 – Foley Street Hand Throw and Spring Switches;

f.  MBTA acceleration of the Eastern/Gloucester Route; and

g.  MBTA's over-inspection of typical designs.

### *COVID-19 Delays*

77.  The COVID-19 pandemic, including the resulting Governmental Orders, restrictions, shutdowns, supply chain impacts, transportation impacts, and workforce impacts, began affecting the North Side ATC Work in or about March 2020 and has continued to impact the North ATC Work ever since.

78.  In particular, COVID-19 had far-reaching impacts on Hitachi Rail's labor force and supply chain, including, but not limited to:

a.  Forcing the design team to abruptly transition to full-time remote working;

b.  Requiring manufacturing facilities and plants to implement new processes and procedures to protect their workers;

c.  Causing the shutdowns of Hitachi Rail's manufacturing plant in Batesburg due to exposures in their workforces;

d.  Causing critical delays to delivery and receipt of parts and equipment from major suppliers;

e.  Requiring Hitachi Rail and its subcontractors to develop processes and procedures to minimize the risks of COVID-19 transmission, which had both a cost and efficiency impact to the progress of the works;

    f.   Resulting in lost work time due to workers at the Project site having to undertake COVID-19 Safety Briefings and other safety standdowns;

    g.   Resulting changes in law, including, but not limited to, various Governor's COVID-19 Orders issued in 2020 and 2021; and

    h.   Resulting access, logistics and safety restrictions.

79.    Section 6.33 [*Force Majeure*] of the General Terms and Conditions to the Contract is a broadly worded Force Majeure provision containing a non-exclusive list of events that allow Hitachi Rail to make a claim for "the impact the delay may have on price and schedule of the work." The non-exclusive list of Force Majeure events in Section 6.33 of the General Terms and Conditions to the Contract includes:

    a.   "epidemic quarantines";

    b.   "acts or failures to act of government agencies and delays related to the MBTA in either their contractual, sovereign or regulatory supply," and

    c.   the more general category of "acts of God."

80.    Section 6.19.3 [*Change in Existing Law*] of the General Terms and Conditions to the Contract provides that the Contractor shall be entitled to receive a change order for the "impact any change in existing law may have on the price and schedule of the work," which is broadly defined and would include COVID-19 legislation, Emergency Orders, and safety mandates/guidelines issued by the legislature or any public body, commission or authority.

81.    Both Section 6.19 and 6.33 of the General Terms and Conditions to the Contract entitle Hitachi Rail to an equitable adjustment to both the price and schedule of the work under Section 6.29 [*Change Order*].

82.     Defendant MBTA owes Hitachi Rail at least $2,705,014.00 for its direct costs resulting from the COVID-19 impacts on the North Side ATC Work, as well as a schedule adjustment of 27 calendar days of critical path delay to the North Side ATC Work.

*Gloucester Draw Bridge and Resequencing in 2020*

83.     In May 2020, Defendant MBTA directed Hitachi Rail to reverse the sequence of the Eastern Route/Gloucester branch from what was anticipated and shown in the approved project schedule.

84.     This sudden change in sequencing by Defendant MBTA was caused by the concurrent Gloucester Draw Bridge Project which was another ongoing MBTA construction project that was located within the physical boundaries of the North Side ATC Work.  Problems had arisen on the Gloucester Draw Bridge Project requiring Defendant MBTA to completely close the tracks for around half of the Gloucester branch line for years, thereby preventing Hitachi Rail from performing its North Side ATC Work on that line in the originally agreed sequence.  In addition, Hitachi Rail required interfacing design information from Defendant MBTA relating to the Draw Bridge Project before it could proceed with the resequenced work.

85.     The Eastern Route/Gloucester Branch impacted by this closure contained approximately one-third of the locations for the North Side ATC Work.  Hitachi Rail had no involvement in the decision to resequence the work or the need to do so.

86.     Defendant MBTA's request to resequence the line constituted a change to the contract time and cost requiring issuance of a change order, yet Defendant MBTA will not issue a change order or pay for the additional work.

87.     Defendant MBTA forced Hitachi Rail to wait to receive the interfacing design information relating to the Draw Bridge Project from Defendant MBTA, causing 92 calendar days of critical path delay.

*Fitchburg Power Easement and Right of Way*

88.     Section 8.2 of the CO 21 Technical Detail makes Defendant MBTA responsible for the permitting for all poles and working on hazardous sites, as well as for obtaining the required approvals and easements.

89.     On October 12, 2020, National Grid advised Hitachi Rail that an issue existed with locating power line poles in the vicinity of White Street in the Town of Leominster as part of the North Side ATC Work on the Fitchburg line.

90.     The next day, on October 13, 2020, Hitachi Rail escalated the issue with the power line poles to Defendant MBTA for resolution and asked Defendant MBTA to contact National Grid to resolve the issue.

91.     Hitachi Rail could not finalize the Engineering Power design submittal for Section 6 of the Fitchburg line until Defendant MBTA resolved the easement/right of way issue with National Grid and confirmed the same to Hitachi Rail.

92.     On March 18, 2021, more than five (5) months after Hitachi Rail raised concerns with Defendant MBTA about locating power line poles in the vicinity of White Street, National Grid advised Hitachi Rail directly that the easement/right of way issue had been cleared.

93.     Hitachi Rail redeployed and reprioritized its power survey and design team to minimize the impact to the critical path during Defendant MBTA's five-month delay in resolving the easement/right of way issue on the Fitchburg Line.

94.     Nonetheless, Defendant MBTA's delay in resolving the easement/right of way issue on the Fitchburg line resulted in 12 calendar days of critical path delay to the North Side ATC Work.

<u>*Block & Control Line Changed Criteria and Issues*</u>

95.     In February 2020, after reviewing Hitachi Rail's first Block & Control Line design for the New Hampshire Main Line, Defendant MBTA changed the design criteria from the controlling contract documents and from what Defendant MBTA agreed to in response to an RFP prior to the submission of the first Block & Control Line, causing Hitachi Rail to have to redesign the New Hampshire Main Line and put its Fitchburg Line Block & Control Line design on hold.

96.     The changed design criteria issue took close to two (2) months to fully resolve.

97.     The Block & Control Line designs were a foundational building block to the more detailed house and segment designs and the signal software design.

98.     Even after clear direction was provided by Defendant MBTA at the end of March 2020 as to the changed designed criteria, the progress of the Block & Control Line designs continued to suffer due to other changed criteria from Defendant MBTA and Keolis Commuter Services, LLC ("Keolis"), its operator.

99.     Defendant MBTA's change in the criteria of the Block & Control Line designs caused 41 days of critical path delay to the North Side ATC Work.

<u>*RFI 136 – Foley Street Hand Throw and Spring Switches*</u>

100.     On January 5, 2021, Hitachi Rail issued RFI 136 in response to Defendant MBTA's request for a formal RFI to revise the switch and hand throw design in the Foley Street vicinity.

101.    Despite the RFI containing a requested response date of January 12, 2021 (one week later), Defendant MBTA waited until January 27, 2021 to affirm and formalize the change of design of the hand throws and switches in the Foley Street vicinity.

102.    Defendant MBTA's late response to RFI 136 caused 7 days of critical path delay to the North Side ATC Work.

### *Defendant MBTA Acceleration of the Eastern/Gloucester Route*

103.    At the PTC Steering Committee Meeting on February 17, 2021, Defendant MBTA confirmed that it intended to accelerate and prioritize the Eastern Gloucester Route, Segment 8 from Gloucester Draw to Rockport, and that it now wanted it to be fully commissioned and cutover by July 2021, which was only five (5) months away.  This new timing was eight (8) months in advance of the agreed dates, as reflected in the project schedule updates.

104.    From February 2021 through to the end of April 2021, Hitachi Rail focused its Eastern Route/Gloucester branch design resources on Gloucester branch, from Segment 6 to Segment 8, in an effort to achieve Defendant MBTA's mid-2021 commissioning and cutover timescale.

105.    Hitachi Rail also diverted its Engineering Power survey resources from the Fitchburg Line to Gloucester Branch.  Hitachi Rail's installation drawing survey resource was also assigned to Gloucester branch, from Segment 6 to Segment 8, to comply with Defendant MBTA's priority.

106.    Defendant MBTA's directed acceleration and prioritization of the Eastern/Gloucester Route caused 59 calendar days of critical path delay. Despite Hitachi Rail's extensive efforts undertaken to satisfy Defendant MBTA's directions, Defendant MBTA ultimately elected not to complete the cutover and commissioning work in mid-2021.

*Defendant MBTA's Failure to Review and Approve Typical Designs Timely and in*
*Accordance with the Contract*

107.    Defendant MBTA regularly did not review the Hitachi Rail design submittals in a timely manner or in accordance with the procedures required by the Contract.

108.    Defendant MBTA also overreached in its role under a Design-Build model by, among other acts, creating entirely new review codings that did not exist under the Contract rather than marking them as "approved", "approved with comments", or "rejected."  This practice impeded the progress of design development.

109.    Defendant MBTA has a contractual duty: (1) to approve design submittals (fully approved, or approved with comments), or (2) to identify specific non-conformances against contract specifications, and reject the design.

110.    Instead of following the contract, Defendant MBTA frequently marked submittals as "Revise and Resubmit" during the Project.  This meant that instead of approving or rejecting design submittals, Defendant MBTA issued comments and observations – without identifying non-conformances – and regularly demanded Hitachi Rail submit designs again.

111.    Defendant MBTA also regularly did not issue the review coding at the time of concluding its reviews.  Only when Hitachi Rail had responded agreeing to comply with Defendant MBTA's comments and observations, did Defendant MBTA then assign "final dispositions."

112.    Since Defendant MBTA's use of the non-contractual review codings frequently required five or six rounds of submittals and re-submittals, these new steps added months to an average design review.

113.    Defendant MBTA's procedures in design approval were a departure from the Contract's requirements.  Defendant MBTA over-inspected the design, and burdened Hitachi

Rail with literally thousands of questions, opinions, comments, and requests.  In one example, Defendant MBTA withheld design approval or rejection from Hitachi Rail by demanding Hitachi Rail first respond to comments on immaterial spelling corrections.

114.    Defendant MBTA consistently violated the contract requirements governing time of review by failing to complete its design reviews within 14 calendar days.

115.    Defendant MBTA's breach of these contractual duties regarding design approvals caused 40 calendar days of critical path delay, as well as causing Hitachi Rail to incur direct costs and damages.

### *Hitachi Rail's Mitigation Plan*

116.    In March 2021, the MBTA issued an instruction to Hitachi Rail to provide a recovery schedule to mitigate the delays to the North Side ATC Work.

117.    Although the MBTA is responsible for all 278 calendar days of delay detailed above, in April 2021 Hitachi Rail presented a proposed mitigation plan that would have mitigated all but 89 days of the MBTA-caused delay.

### *The MBTA's Preferential Commissioning Plan Extended the Schedule*

118.    After reviewing Hitachi Rail's proposed mitigation plan for 2-1/2 months, and without ever accepting or approving it, Defendant MBTA imposed its own so-called "Preferential Commissioning Plan" at a Steering Committee Meeting of the Parties in July 2021, which differed materially from Hitachi Rail's April 2021 proposed mitigation plan.

119.    In fact, the MBTA's Preferential Commissioning Plan did not seek to mitigate any delays.  Instead the plan extended the North Side ATC Work, adding seventeen (17) months to the PTC Safety Project schedule, with a new completion date scheduled in August 2023.

120.    Upon information and belief, Defendant MBTA's Preferential Commissioning Plan was designed to ensure that MBTA's Commuter Rail Operator, Keolis, could comfortably resource the remaining North Side ATC Work with its restricted personnel for track support (*e.g.*, flaggers), testing, commissioning and cutovers.

121.    As such, Defendant MBTA's Preferential Commissioning Plan also directly benefitted Defendant MBTA.  With this new extended schedule, Defendant MBTA could theoretically avoid defaulting on its obligations in the CO 21 Technical Detail to provide appropriate levels of flaggers and other Keolis resources to meet the original Baseline Schedule or to support Hitachi Rail's Mitigation Plan.

122.    Defendant MBTA effectively usurped control of the schedule from Hitachi Rail and required Hitachi Rail to implement the Preferential Commissioning Plan.

123.    By imposing the Preferential Commissioning Plan, Defendant MBTA added 515 days – almost 17 calendar months – to the original performance period of 32.5 months.

124.    The delays and schedule extensions imposed by Defendant MBTA entitle Hitachi Rail to both extensions of time and added costs.  Defendant MBTA's failure to recognize such delays and additional costs constitutes a material breach of the governing contract documents with Hitachi Rail.

125.    Defendant MBTA's delays described herein caused Hitachi Rail to incur monetary damages in an amount to be proven at trial, but at least $87,556,878.79, including, but not limited to:

a.    Prolongation Costs to allow Hitachi Rail to recover its extended general conditions, including, but not limited to, additional project management, office lease, Site and Home Office overhead, and bonding costs incurred due

to the extended performance period caused by the activation of MBTA's
Preferential Commissioning Plan;

b.   Direct costs incurred from Hitachi Rail aborting shifts as a result of Defendant
MBTA failing to ensure the required level of track support for the North Side
ATC Work;

c.   Direct costs incurred as a result of the COVID-19 impacts on the PTC Safety
Project; and

d.   Additional costs and damages arising from delays and interruptions to the
North Side ATC Work for which the MBTA is responsible.

### C.   Failure to Grant Contractual PTC System Acceptance Caused $3,332,265.00 in Damages

126.   The governing contract documents for the PTC Safety Project require Hitachi Rail
to provide maintenance and support through "System Acceptance."

127.   The PTC System was signed off by Defendant MBTA in or around August 2020,
and the system then went into revenue service.  Defendant MBTA has had beneficial use of the
PTC System since that date.

128.   In Technical Specification, Section 11.6, the Base Contract states that following
the successful transition of all control operations to the PTC System, an Availability Test begins.
This test continues until the specified availability is achieved.

129.   More specifically, the Availability Test is complete when Defendant MBTA
verifies the PTC System's ability to meet the specified availability requirements during normal
revenue service hours and non-revenue hours.

130.    Technical Specification, Section 14.1 of the Base Contract states that the "Acceptance Period" is the 120-day availability testing period identified in Technical Specification Section 11.6.

131.    The installed PTC system achieved successful completion of the 120-day Availability Test by May 6, 2021.

132.    Once the Availability Test is complete under the provisions of Technical Specification, Section 11.6, the contractual Acceptance Period ends, and as a matter of law, Hitachi Rail achieved System Acceptance.

133.    Contrary to operation of the governing contract, Defendant MBTA refused to grant Hitachi Rail contractual System Acceptance until February 29, 2024, requiring Hitachi Rail to continue to provide maintenance and support to the PTC System in the interim, compared with the lesser support provided for during the subsequent Warranty Period.

134.    Defendant MBTA's refusal to timely grant Hitachi Rail PTC System Acceptance has caused, among other things, the subsequent Warranty Period to be in effect for almost three years after the date when it should expire.

135.    Defendant MBTA's refusal to grant Hitachi Rail PTC System Acceptance is a material breach of a valid and enforceable contract.

136.    Defendant MBTA's refusal to grant Hitachi Rail PTC System Acceptance caused Hitachi Rail to incur monetary damages in an amount to be proven at trial, but at least $3,332,265.00.

**D.    Unfunded Changes Caused $36,190,009.95 in Direct Cost Damages**

137.    In relation to the scope of work on the PTC Safety Project, Defendant MBTA regularly directed Hitachi Rail to provide more costly materials than those required by the

governing contract documents and to perform duties outside the scope of the governing contract documents, while refusing to pay for either.

*PTC Out of Scope Changes*

138.    Such instances relating to the PTC System installation include, but are not limited to, the following:

| | **Description** | **Value** |
|---|---|---|
| PTC-1 | MAX Radio Migration | $1,656,922.43 |
| PTC-2 | ADU Change | $2,142,177.49 |
| PTC-3 | ACES Communication Security | $5,917,461.43 |
| PTC-4 | South Side ATC IXL Upgrade Addendum | $3,607,515.57 |
| PTC-5 | Additional Power Design/Installation | $4,084,918.84 |
| PTC-6 | Additional Fiber Design/Installation | $1,719,583.13 |
| PTC-7 | Cabot to Broad Change Order Addendum | $205,542.49 |
| PTC-8 | Rosemary Crossing EL 13.3 | $182,479.03 |
| PTC-9 | CSX Issues with PTC Design for Wachusett | $100,010.76 |

139.    Issues labeled as PTC-1 through PTC-3 each relate to requests by the MBTA for equipment or components that were superior to and more costly than what was provided for in the Technical Specification to the Base Contract.

140.    For example, the PTC-3 issue concerns Defendant MBTA's request for Hitachi Rail to provide a specific wireless security feature that was not included in Hitachi Rail's bid, is not mentioned as a requirement in the Technical Specification, and is not required by federal law.  Despite this request being out of Hitachi Rail's scope work, Defendant MBTA directed Hitachi Rail to provide the wireless security feature and then refused to pay Hitachi Rail for its cost incurred to do so.  In this one example, Defendant MBTA caused Hitachi Rail damages of at least $5,917,461.43.

141.    The remaining PTC issues referenced in the chart above arise from Defendant MBTA's refusal to pay Hitachi Rail for out of scope work performed.

*ATC Out of Scope Changes*

142.   Instances of unfunded material contract changes made by Defendant MBTA

regarding the ATC System installation include, but are not limited to, the following:

|  | **Description** | **Value** |
|---|---|---|
| ATC-1 | ATC for Tower A to Swift (Fitchburg Line) | $644,892.15 |
| ATC-2 | CS45 Predictor Incompatibility with E2 Unit | $574,882.25 |
| ATC-3 | Additional Radio Design Work | $4,500,000.00 |
| ATC-4 | Foley St Additional Signal and IXL upgrade | $415,383.78 |
| ATC-5 | AY Goalpost & FG & Shop Cantilever Signal Structures | $706,982.15 |
| ATC-6 | Gloucester Freight MAS Change FX Control Line Redesign | $487,601.30 |
| ATC-7 | Bay Road DC  Island Change & South St | $39,791.93 |
| ATC-8 | Gloucester RCS20.2 Redesign and Relocation | $614,085.98 |
| ATC-9 | Snake Hill Road Cable Replacement | $150,240.36 |
| ATC-10 | NCR003 Retrofit IXL GBN Connections | $448,807.77 |
| ATC-11 | Pre-Excavation Pack Approval | $320,723.70 |
| ATC-12 | Track Support Cancellations (Aug-Dec 2021) | $94,979.33 |
| ATC-13 | AIS Book of Plans Changes | $799,254.87 |
| ATC-14 | Stabilization Piles | $728,906.38 |
| ATC-15 | Alstom Grade Crossing Support | $722,587.44 |
| ATC-16 | National Grid Test Pits | $145,923.02 |
| ATC-17 | FX & Reading Track Layout Civil Drawings | $441,987.65 |
| ATC-18 | Haverhill Station TAWS | $138,453.53 |
| ATC-19 | R to R Aspect Improvement at Tower A | $50,000.00 |
| ATC-20 | Albion St Crossing Change | $31,165.06 |
| ATC-21 | Power Design Change FX & Reading | $71,902.98 |
| ATC-22 | CPF-FR L2 Signal Relocation | $61,741.57 |
| ATC-23 | Tower A Fiber Connection | $40,980.86 |
| ATC-24 | SA to R at Foley St | $39,143.52 |
| ATC-25 | Everett Jct BCL redesign | $247,734.00 |
| ATC-26 | WRML Crossing Design | $407,214.51 |
| ATC-27 | Increased HSE/CONS field supervisors (3 FTE) | $3,344,032.69 |
| ATC-28 | GLX, LiDAR | $250,000.00 |

143.   Four of the ATC issues referenced above relate to the work that Hitachi Rail

performed so that Defendant MBTA could meet the federally mandated ATC safety

requirements that were not included in the CO 21 Technical Detail: ATC-1, ATC-2, ATC-3, and

ATC-9.

144.     More specifically, looking at just the issue referenced in ATC-3: the "Additional Radio Design Work" relates to Defendant MBTA's direction for Hitachi Rail to perform survey and design work at a system wide level for radio coverage.  Defendant MBTA's demands are outside the scope of Section 8.2 of the CO 21 Technical Detail that specifically excludes this type of "survey, design, or testing" from Change Order 21.  This out of scope work is ongoing, but Hitachi Rail estimates this out of scope work will cost Hitachi Rail at least $4,500,000.00.

145.     By way of further example, eight of the ATC issues referenced above relate to the work that Hitachi Rail performed to improve the North Side Commuter Rail Lines and associated infrastructure beyond what was included in the CO 21 Technical Detail, including, but not limited to, claims for differing site conditions: ATC-4, ATC-5, ATC-6, ATC-7, ATC-10, ATC-13, ATC-14, ATC-15.

146.     Further still, four of the ATC issues referenced above relate to Defendant MBTA directing Hitachi Rail to perform out of scope work relating to excavation procedures and track cancellations, which stemmed from actions of Defendant MBTA, Rail Operator Keolis, and National Grid.  These issues include, but are not limited to: ATC-8, ATC-11, ATC-12, and ATC-16.

147.     Defendant MBTA's out of scope directives constitute a material breach of the contract documents governing the PTC Safety Project.

148.     These referenced instances where Defendant MBTA directed Hitachi Rail to provide materials or perform duties outside the scope of the governing contract documents have caused Hitachi Rail to suffer monetary damages in an amount to be proven at trial, but at least $36,190,009.95.

### E.    Summary of Total Damages

149.    As a result of Defendant MBTA's breaches of contract, Hitachi Rail has suffered

monetary damages in an amount to be proven at trial, but at least $158,382,985.31, as

summarized below:

| Description | Value |
|---|---|
| A.  Work Demanded Beyond Fixed Price and Terms | 36,131,331.82 |
| B.  MBTA-Caused Delays | 87,556,878.79 |
| C.  Failure to Grant Contractual PTC System Acceptance | 3,332,265.00 |
| D.  Other Unfunded Changes Causing Hitachi Rail to Incur Direct Costs | 36,190,009.95 |
| Potential Overlap Among Above Categories[4] | (4,827,500.25) |
| **Total:** | **$ 158,382,985.31** |

## COUNT II – Breach of Covenant of Good Faith and Fair Dealing

150.    Hitachi Rail adopts and incorporates by reference paragraphs 1-149 as if fully set

forth herein.

151.    Defendant MBTA has, without valid excuse, failed and refused to provide timely

or complete responses to and consideration of Hitachi Rail's requests for change orders, among

other improper conduct.

152.    Defendant MBTA has, without valid excuse, failed and refused to make full

payment to Hitachi Rail for work performed and accepted under the Contract, including for the

requests for payments on the unfunded changes described in this Complaint.

153.    Defendant MBTA's unreasonable refusal to pay these changes constitutes a

breach of the covenant of good faith and fair dealing.

---

[4] Hitachi Rail is not seeking a windfall and applied a credit of $4,827,500.25 to account for all *possible* overlap between the four categories of claims.

154.    Defendant MBTA has also unreasonably attempted to indefinitely prolong the alternative dispute resolution process contemplated by the Contract in order to prevent Hitachi Rail from obtaining the contractual and legal relief to which it is entitled.  This constitutes a further breach of the covenant of good faith and fair dealing.

155.    Defendant MBTA's breaches of the implied covenant of good faith and fair dealing have damaged Hitachi Rail in amounts in excess of $158,382,985.31, exclusive of interest, and such further amounts as to be demonstrated in this action in addition to interest.

### COUNT III – Unjust Enrichment/Quantum Meruit

156.    Hitachi Rail adopts and incorporates by reference paragraphs 1-155 as if fully set forth herein.

157.    Hitachi Rail provided labor, materials, equipment, and services to the PTC Safety Project at Defendant MBTA's direction and for the benefit of Defendant MBTA.

158.    Defendant MBTA accepted the work performed by Hitachi Rail.

159.    Defendant MBTA had reasonable notice that Hitachi Rail would be performing the work on the PTC Safety Project and expected compensation from Defendant MBTA for such work.

160.    Hitachi Rail completed work on the PTC Safety Project in good faith and in anticipation of receiving payment therefor.

161.    Defendant MBTA has failed to pay Hitachi Rail for the work performed and that it accepted and received the benefit of in connection with the Project.

162.    Hitachi Rail is entitled to payment for the fair value of the work it performed in an amount to be proven at trial, but at least $158,382,985.31.

163.    Defendant MBTA has been unjustly enriched by failing and refusing to pay Hitachi Rail for the work on the Project that Hitachi Rail performed at Defendant MBTA's direction and for which Defendant MBTA has received both financial and tangible benefit.

## COUNT IV – Declaratory Relief

164.    Hitachi Rail adopts and incorporates by reference paragraphs 1-155 as if fully set forth herein.

165.    An actual controversy exists between Hitachi Rail and Defendant MBTA regarding the rights and legal relations of each under the Contract, including Change Order 21.

166.    Hitachi Rail is entitled to a declaration that the key dates and milestones in the Contract shall be extended 515 days.

167.    Hitachi Rail is entitled to a declaration that the date of contractual System Acceptance for the PTC System shall be adjusted to May 6, 2021.

## JURY DEMAND

Plaintiff Hitachi Rail demands a jury as to all matters described in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Hitachi Rail STS USA, Inc. prays for the following relief:

a)    Judgment entered in favor of Plaintiff and against Defendant on Count I of Plaintiff's Complaint, an award of compensatory damages of not less than $158,382,985.31; and/or

b)    Judgment entered in favor of Plaintiff and against Defendant on Count II of Plaintiff's Complaint, and an award of compensatory damages of not less than $158,382,985.31; and/or

c)      Judgment entered in favor of Plaintiff and against Defendant on Counts III of Plaintiff's Complaint, and an award of compensatory damages of not less than $158,382,985.31;

d)      For Count IV of Plaintiff's Complaint, a declaration that Hitachi Rail is entitled to a 515-day extension of the key dates and milestones in the Contract;

e)      For Count IV of Plaintiff's Complaint, a declaration that the date of contractual System Acceptance for the PTC System shall be adjusted to May 6, 2021;

f)      An award of pre-judgment interest attorney fees, costs, and post-judgment interest in favor of Plaintiff and against Defendant; and

g)      Any other further legal or equitable relief that this Court deems just and proper.

Dated: April 16, 2024          Respectfully submitted,

PLAINTIFF, HITACHI RAIL STS USA, INC.

By its attorneys,


Wendy Kennedy Venoit (BBO #56857)
Douglas J. Mackin (BBO #708812)
Cozen O'Connor
200 State Street, Suite 1105
Boston, MA 02109
Tel: 617-849-5002
wvenoit@cozen.com
dmackin@cozen.com


*/s/ James L. Loftis*
James L. Loftis*
Peter Danysh*
M. Kyle Reynolds*
Vinson & Elkins LLP
845 Texas Avenue
Suite 4700
Houston, TX 77002
Tel: 713-758-2222
jloftis@velaw.com
pdanysh@velaw.com
kreynolds@velaw.com

* *Pro Hac Vice Admission Requested*